J-S15006-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| LAUREN BROWN | : | |
| Appellant | : | No. 1224 WDA 2024 |

Appeal from the Judgment of Sentence Entered June 3, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0004463-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| LAUREN BROWN | : | |
| Appellant | : | No. 1254 WDA 2024 |

Appeal from the Judgment of Sentence Entered June 3, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0001274-2024

BEFORE: OLSON, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY OLSON, J.: **FILED: June 4, 2025**

Appellant, Lauren Brown, appeals from the judgment of sentence entered June 3, 2024, as made final by the denial of his post-sentence motion on September 18, 2024. We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

The trial court summarized the relevant facts and procedural history of this case as follows.

> Appellant was charged with the shooting death of Kelly Cody that occurred in McKees Rocks[, Pennsylvania,] on January 21, 2021. Frank Jones owns a local notary business located [along] Broadway Avenue. On January 21, 2021, Jones and his son, Isaiah, arrived at the store sometime between 7:30 a.m. and 7:45 a.m. Shortly after turning on the lights, a tall black male with facial tattoos and wearing a red sweatshirt entered the store. This male told them there had been a drug[-]related shooting and to call 911. At trial, Isaiah Jones identified Appellant as the male who entered the store to report the shooting. Appellant left while Isaiah Jones spoke to the 911 operator. These events were captured by business surveillance cameras and the footage was played at trial. Using the surveillance footage, Frank Jones captured still photos of the male and texted them to Kennedy Township Police Chief Anthony Bruni.
>
> Officers James Duss and Nicholas Hryadil of the Stowe Township Police Department responded to the 911 call around 8:16 a.m. Upon arrival [at Penn Alley in McKees Rocks, officers] observed a white female on the ground in the alleyway. No other persons were present. Her body was convulsing and Officer Duss applied pressure to an obvious head wound while awaiting an ambulance. After Cody was transported from the scene, Officer Duss remained to help secure the area.
>
> Dr. Ariel Goldschmidt, an expert in forensic pathology who serves as a medical examiner for Allegheny County, testified that Cody died from a single gunshot wound to the head and the manner of death was homicide. A single bullet was retrieved during the autopsy. The range of the wound was found to be indeterminate, as no soot or stippling associated with gun powder residue was detected or observed at the site of the wound.
>
> Kennedy Township and Allegheny County police were called to assist in the investigation. Chief Bruni and Officer [Aaron] Dhanse from the Kennedy Township Police Department helped to secure the perimeter of the crime scene. It was during this time that Chief Bruni received the still photographs from Frank

Jones. Shortly after, he observed a male dressed in dark jeans and a black t-shirt walking down the alley. This male, who was identified as Appellant at trial, caught [Chief Bruni's] attention because[, *inter alia*,] it was extremely cold outside. [Thereafter, Chief Bruni attempted to approach Appellant and] asked Appellant for his name several times . . . but Appellant did not answer and continued walking. The officers continued to ask for his name as they followed Appellant into a nearby market. Appellant continued to ignore their requests as he walked throughout the store. Appellant exited the store after an employee ordered him to leave. In[-]store surveillance cameras captured these movements. Chief Bruni and Officer Dhanse followed behind Appellant, who immediately upon exiting, ran into traffic. Neither Chief Bruni nor Officer Dhanse were able to follow him.

It was at this time that Stowe Township Officer Hryadil approached the 700 block of Broadway [Avenue]. He began a foot pursuit of Appellant, who ignored multiple commands to stop. Frank and Isaiah Jones, who were now inside a local restaurant on Broadway, witnessed police chasing Appellant. Officer Hryadil testified that during the foot pursuit Appellant threw an object that made a metallic sound when it hit the ground. Allegheny County Detective Dale Canofari, who was also engaged in the foot pursuit, recognized that the discarded item was a gun and alerted fellow officers. Officer Hryadil subdued Appellant with his taser. Appellant alerted officers that he had a firearm in his pocket. Subsequently, police seized a .25 caliber handgun during the search of his person. The discarded firearm was recovered and found to be a loaded 9mm Taurus pistol.

Appellant was transported to a hospital accompanied by Detective Canofari. During this transport, Appellant asked Detective Canofari if "she" was ok. While being transported from the hospital to Allegheny County Police Headquarters, Appellant told Allegheny County Police Officer David Hillard that the shooting victim [was] his girlfriend and asked how she was doing.

Once at headquarters, Appellant was secured in an interview room and his hands were swabbed for gunshot residue (GSR). Sometime thereafter, Detective Canofari knelt on the floor to remove the device that secured Appellant's ankle to the floor and discovered a .25 caliber bullet beneath the table.

Appellant was in an agitated state while at headquarters, so he was transported to the Allegheny County Jail without being interviewed. During the intake procedures at the jail two [] rounds of ammunition were seized from Appellant's rear pants pocket. They were identified as 9mm and .25 caliber bullets.

During the investigation, it was learned that Cody resided in a second-floor apartment located [along] Broadway Avenue. The apartment was searched and in a bedroom police recovered a cell phone, empty glassine bags consistent with the packaging of heroin/fentanyl, needles, and a .25 caliber bullet. Men's clothing was also found at the apartment.

At the rear of Cody's apartment building police discovered a parked Chevy Equinox. The passenger side of the vehicle had swipe marks along the doors and the ground beneath the area appeared disturbed. A 9mm bullet was found at the right rear tire. A spent .25 caliber cartridge casing and a woman's shoe were also collected from this location.

The investigation produced information that a silver Chevy Malibu with a Florida license plate was seen leaving the alleyway around the time of the shooting[.] Through the use of license plate readers, police identified the vehicle as a rental car leased to Travis Prince. Hours later on January 21, 2021, Allegheny County Police Detective Stephen Hitchings made contact with Travis Prince. Prince was driving the same silver Chevy Malibu [that was seen leaving the McKees Rocks alleyway around the time of Cody's shooting]. During this encounter, Prince handed Detective Hitchings a .25 caliber cartridge casing that he found inside the vehicle.

\*\*\*

[At trial,] Prince relayed to the jury that on January 21, 2021, around 7:00 a.m., he communicated with Cody *via* Facebook about selling her drugs. He admitted at trial that he did not initially disclose this fact to police. After he made arrangements with Cody, Prince drove to an address she provided. Upon arrival, Cody instructed him to meet her at the rear of the building. Prince parked his Chevy Malibu between a dumpster and a red van. Moments later, Cody got into the front passenger seat and asked for a cigarette. Immediately after, Prince's door opened and he was pulled from the car at gunpoint by a tall black male, approximately 6'4" with a facial tattoo and wearing a red hooded sweatshirt. Prince was struck in the face

- 4 -

with the gun. He struggled with the male and the gun discharged twice, with one of the bullets grazing his head. Prince explained that he was then able to break free. Once he was around a corner, Prince briefly engaged with a woman who was on her front porch, who told him she was going to call the police. Prince discarded the drugs that he had planned to sell Cody and kept an eye on the scene. After he saw the male run from the area, Prince made his way back to his car. Cody was no longer in the vehicle and he drove away.

Surveillance footage obtained from a local business and a residence corroborated Prince's movements both on foot and when he drove away from the scene. Additionally, police recovered narcotics from an open lot where Prince described discarding them. Prince testified at trial that during the incident he had a silver 9mm handgun on his person, but it slid down his pants and fell out as he escaped Appellant. On cross-examination, Prince denied shooting Cody during a drug deal.

\*\*\*

Appellant testified in his own defense and also denied shooting Cody. He told the jury that he had been in a relationship with Cody in the months preceding the shooting and admittedly stayed overnight at her apartment from January 20, 2021 until the morning hours of January 21, 2021. On the morning of January 21[,] Cody used Appellant's phone to text someone to meet her and a short time later she left and headed to the rear of the building. Appellant peered out a window and saw two [] cars parked in the back. He suspected Cody was purchasing drugs, so after a couple minutes he wanted to check on her. He put on a red hooded sweatshirt and walked from the front of the building around to the back, at which time he saw a grey vehicle with the driver's door open. Cody was in the front passenger seat and was the sole occupant. She was unresponsive, barely breathing, and bleeding from an obvious head wound. He removed her from the vehicle and rested her alongside the car. Appellant testified he saw two [] guns nearby and collected them in his frantic state. He placed a .25 caliber pistol in his pocket and a 9mm handgun in his waistband, explaining that it was too large to fit in his pocket. After taking the guns, he walked onto Broadway Avenue. Consistent with the testimony from Frank and Isaiah Jones and corresponding surveillance footage, Appellant testified that he entered the

- 5 -

notary business and told them to call 911, indicating a drug deal went wrong. From there, Appellant walked further down Broadway and called a friend to see if he could go to [the friend's] apartment. Once inside, he removed his sweatshirt because he got hot and shortly after left to get cigarettes. While outside he encountered police who repeatedly asked him for his name. Appellant ignored them, explaining to the jury that he was nervous, frantic, and trying to get cigarettes. This continued as Appellant entered a local market. However, he had to leave the store after the employee told him he was trespassing. He exited out the front of the store and ran from the police to avoid them. He acknowledged being chased by police, denied discarding a firearm, testifying that the 9mm firearm "flew off" of his body prior to him being tased. However, he admitted to telling police that he had a .25 caliber firearm in his pocket. No other witnesses were presented [by the defense].

Trial Court Opinion, 2/12/24, at 4-13 (internal citations omitted).

Ultimately,

After a three-day jury trial that commenced on February 28, 2024, Appellant was convicted [at trial court docket CP-02-CR-0004463-2021 of third-degree murder, aggravated assault and tampering with or fabricating physical evidence.[1] In addition, at trial court docket CP-02-CR-0001274-2021, Appellant was convicted of two counts of possession of a firearm prohibited.[2]] On June 3, 2024, Appellant was sentenced at CP-02-CR-0004463-2021, Count 1 – [third-degree murder] to [20] to [40] years of incarceration; Count 2 - aggravated assault, six [] to [12] years of incarceration; and at Count 3 - tampering with evidence, no further penalty. These sentences were [imposed] consecutively. At CP-02-CR0001274-2024 Appellant was sentenced at both Count 1 and 2 – possession of a firearm prohibited, to seven [] to [14] years of incarceration with the sentences running concurrently. The sentence at CP-02-CR-0001274-2024 was ordered to run consecutive to that imposed at

_____

[1] 18 Pa.C.S.A. §§ 2502(c), 2702(a)(1), and 4910, respectively.

[2] 18 Pa.C.S.A. § 6105.

CP-02-CR-0004463-2021, resulting in an aggregate sentence of [33] to [66] years of incarceration.

On June 5, 2024, a post-sentence motion was filed by trial counsel Frank Walker, [Esquire]. Thereafter, he was permitted to withdraw as counsel and Corrie Woods, [Esquire] was appointed to represent Appellant. Attorney Woods filed a supplemental post-sentence motion on September 16, 2024. Through this motion[, Appellant] challenged both the sufficiency and the weight of the evidence, the denial of Appellant's suppression motion, and asked the [trial c]ourt to reconsider [Appellant's] sentence. The motion was denied on September 19, 2024. [This timely appeal followed].

*Id.* at 2-3 (footnotes added) (unnecessary capitalization omitted).

Appellant raises the following issues for our consideration.

1. Did the trial court err by denying [Appellant's] pre-trial motion to suppress, specifically, by holding that [Appellant's] seizure by [the police] officers was not an illegal seizure?

2. Did the trial court err by sentencing [Appellant] consecutively on the basis that the convictions stemmed from "separate act[s]", a conclusion unsupported by the record and belied by the Commonwealth proceeding [at] trial on a theory of transferred intent, *i.e.*, that [Appellant] allegedly engaged in a single criminal episode rather than multiple "separate act[s]?"

Appellant's Brief at 6.

In his first issue, Appellant challenges the trial court's suppression ruling. Initially, Appellant ostensibly recognizes that, at the time the officers followed him into the convenience store and, in turn, "blocked [Appellant's] exit from the store," he was subjected to an investigative detention. Appellant's Brief at 26. Because, in Appellant's view, the officers lacked "reasonable suspicion or probable cause to affect such a seizure of [his]

person," Appellant claims that the firearm he subsequently discarded was subject to suppression. *Id.* at 26 and 28. Appellant's claim lacks merit.

This Court has recognized:

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of [the Fourth Amendment of the United States Constitution and] Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.
>
> ***
>
> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a person of reasonable caution in the belief that the action taken was appropriate.
>
> The question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity.
>
>> In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Luczki*, 212 A.3d 530, 544-545 (Pa. Super. 2019) (internal citations, quotations, brackets, and ellipses omitted).

Moreover, we have determined:

Among the factors to be considered in establishing a basis for reasonable suspicion are tips, the reliability of the informants, time, location, and suspicious activity, including flight. Reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. When evaluating whether reasonable suspicion existed in a particular case, this Court must view the circumstances through the eyes of a trained officer, not an ordinary citizen. Reasonable suspicion depends upon both the content of the information possessed by the police and its degree of reliability.

*Commonwealth v. Milburn*, 191 A.3d 891, 898 (Pa. Super. 2018) (internal citations and quotations omitted).

At the February 6, 2023 suppression hearing, the trial court set forth its' findings of fact relevant to the issue of suppression.

That Officer Dhanse testified on January 21[,] 2021, he was working a daylight shift in uniform when he was called to assist neighboring Stowe Township Police with a shooting call.

Upon arriving on scene, he was provided with a description of a suspect; a tall black male wearing a red hoodie.

He was asked to secure an alleyway near the scene. He described the weather conditions as cold and temperature in the twenties.

He then testified that he observed a tall black male wearing a black T-shirt, who was later identified as [Appellant], walking up and down Dohrman Street . . . and looking into and around an alley which is the area that had been the subject of a shooting where an individual had been killed not long before that.

Appellant's physical description, proximity to the scene and his conduct in looking up and down the alley and not wearing a coat

- 9 -

on a cold day, led Officer Dhanse to suspect that Appellant was in the shooting which was under investigation.

He exited his vehicle to approach [Appellant]. He testified that he was at the time with Chief Anthony Bruni. That Officer Dhanse asked [Appellant] to wait a minute so he could talk to him, but [Appellant] continued to walk away.

He testified that he continued to follow [Appellant, when Appellant] entered a convenience store and walked to the rear of the store. Officer Dhanse continued to try and speak to [Appellant] without any response.

The store employee asked the police to remove [Appellant] at that time.

Officer Dhanse followed him into the back. [Appellant] made his way to the back, turned around, went towards the front and exited.

He testified that [Appellant] then began to run upon exiting the convenience store and the police engaged in a foot pursuit. By the time he had caught up in the area where [Appellant] was, [Appellant] was on the ground, having been tased and detained by another police officer.

He indicated that at the time that he first noticed [Appellant] when he was wearing a T-shirt and pacing, he testified that he was not suspected of having committed a crime. Officer Dhanse explained that he believed [Appellant] was free to leave, and he never ordered him to stop during these interactions.

Chief Bruni testified, and this is a combination of testimony from the July 20th hearing and what occurred today, that he has been working as a police officer for 33 years, the Chief of Kennedy Township for 20 years. That his role on that day, on January 21[,] 2021, was to assist Stowe Township. He indicated that there was a mutual agreement between Stowe Township and Kennedy to provide assistance to each other as the townships border one another.

On January 21[,] the Chief was on duty and responded to a morning shooting call in Stowe Township. He described the weather as very cold, and he assisted by helping to secure a perimeter of the crime scene along with Officer Dhanse.

The Chief was shown a still photo obtained from an in-store surveillance camera from a local business, which was a notary business. That he knew the owner for approximately [10] years. That his name was Frank Jones and that he obtained a photograph from the individual in the store. That Mr. Jones told him that that person had just come into his store and said that a woman had been shot. That that occurred within minutes before seeing [Appellant] in this case out in the roadway area.

Chief Bruni also testified that . . . while securing the scene [he was] in possession of the photograph which [showed the individual] believed to be a suspect [as] a large black male wearing a red hoodie with dark blue jeans. That he observed a male, later identified as [Appellant], who he believed matched this description, although at that time when he observed him on the street, he was wearing just a T-shirt and blue jeans despite the cold temperatures. That the Chief walked towards [Appellant], asked him his name and if he could talk. [Appellant] then walked away from [the Chief] and the other officer. He described [Appellant] as seeming disoriented and that [Appellant] did not respond to the questions.

Chief Bruni then testified that he and the other officer followed [Appellant] into the Blue Eagle Market. As [Appellant] entered the back room, he testified a store employee yelled that [Appellant] was trespassing and asked that [Appellant] would leave.

[The Chief] then testified that [Appellant] then exited out the front and that he and Officer Dhanse continued to ask for [Appellant's] name and for identification, as [Appellant] was not responsive.

[Appellant] then fled on foot, and they began a foot pursuit, and that they did not have contact with [Appellant] again until they came upon [Appellant] where he had been detained by another officer and after [Appellant] was tased.

He also testified that he did not see [Appellant] commit any type of crime and, additionally, that when [Appellant] left upon the employee asking him to leave, that he was not cited or arrested for trespassing.

I also think of particular note here, that both the officer and the Chief -- the [c]ourt has just described their testimony -- testified that between the time when they first started asking

- 11 -

[Appellant] for his name and area of time in which they interacted with him in the store, that they, somewhere between five and [10] times, asked him for that particular information to identify himself.

The [c]ourt also reviewed the video surveillance which largely corroborates the testimony of the officers. It shows [Appellant] entering the Blue Eagle Market. [Appellant] is in the market for approximately 20 seconds when he turns around and begins walking towards the front door. Officer Dhanse walks in, keeps the front door open, and is standing directly in front of the door with the Chief directly behind him where there is a conversation that cannot be heard on video that occurs for about 45 seconds.

The [c]ourt would note that there are several people, including an employee in the store and someone who appears to be a patron, standing within three to five feet of the conversation while it is occurring. No one walks or backs away or in any way, based on the video, appears to be disturbed by what is occurring, or they certainly do not leave the area.

At one point it could be seen that [Appellant] takes a small step to his left. The officer who [is] talking with him in the doorway then also slides slightly, which would be to his right, and stays in front of [Appellant].

[Appellant] then walked back down through the aisle into a back storage area. Officer Dhanse follows him into the back storage area. For a short period of time has a brief conversation. Again, there is no audio. [Appellant] then walks out. The Chief is in front of [Appellant], approximately five feet in front of him, and the officer -- the other officer, Dhanse, is about five feet behind him. They all walk out together, one after the other, and at some point you are no longer able to see them.

At no point during the interaction in the Blue Eagle Market does there appear to be any contact by the officers. In fact, when Officer Dhanse is talking with him, his hands are actually in his pockets in a fairly relaxed way, and at no point is [Appellant] touched during, the course of the Court's review of the video.

Further testimony was elicited at the suppression hearing from Detective Kinavey, who testified that he's with the Allegheny County Police Homicide Unit. He indicated that he responded to a request by Stowe Township Police to assist in a homicide investigation.

From that investigation, he learned that a 911 call came after a person entered a notary public to report that a shooting had occurred in an alley. The caller described the suspect as a large, tall black male wearing a red sweatshirt, black pants and shoes.

Detective Kinavey went to the scene where [Appellant] had been taken into custody and was informed that two firearms had been recovered; a .25-caliber pistol from the defendant's person and a silver semiautomatic pistol from underneath a Public Works truck.

The [c]ourt also considered testimony from the June 9[,] 2021, preliminary hearing.[3] This included testimony from Detective Dale Canofari, also testimony again from Detective Kinavey, and testimony from a Travis Prince. That information and the exhibits that were submitted at the time of the preliminary hearing revealed the following:

Detective Canofari testified that he was an Allegheny County Police Detective who was working on January 21[,] 2021. Approximately 9:00 a.m. the Allegheny County Police were called to assist in the shooting death of Kelly Cody that had occurred in Stowe Township.

Detective Canofari along with Detective McCue drove to the scene, and about one block from the crime scene, they came upon a foot chase between the police and an individual later identified as [Appellant].

Detective Canofari joined the foot pursuit, and he observed [Appellant] toss a gun. It was a two-tone, silver on the top and black on the bottom. It was later recovered beneath a truck and determined to be a 9mm firearm.

A Stowe Township officer deployed a Taser which struck [Appellant]. [Appellant] was then cuffed and searched, at which time a second gun, a .25-caliber semiautomatic pistol, was seized from his right front pants pocket. Photographs of those items were submitted at the time of the preliminary hearing.

_____

[3] At the suppression hearing, the parties agreed that the trial court could consider the testimony set forth during the preliminary hearing in this matter. *See* N.T. Hearing, 2/6/23, at 4.

Travis Prince testified, and he testified that he was Facebook friends with Kelly Cody. That he had spoken to her around 7:30 a.m. He described that he had made plans to meet up with her at her residence around 8 a.m. that morning. That he pulled into a parking spot in an alley, as directed by Ms. Cody, and that she met him down at his car.

He further described that someone opened his driver's side door and pulled him out of the car at gunpoint. He described the gun as small and silver and the individual that pulled him out as a tall black male who was wearing a red hoodie. He said he was pistol-whipped and several shots were fired. He struggled with the male and then was able to run off.

He described being unfamiliar with the area and staying nearby and also described that he kept an eye on the male and after about five minutes the male left the area and he returned to his car, drove to a friend's house located in McKees Rocks. He indicated that he did not know the whereabouts at that time of Kelly Cody.

He was contacted later that night by police. Turned over evidence that had been -- he had located in his vehicle.

Detective Kinavey also testified at the preliminary hearing and indicated that he had been called to the scene and had received a 911 call that had come from a notary business located on Broadway Avenue who appeared to be reporting a shooting based on information received from a third party.

He testified that the victim had already been transported to Allegheny General Hospital by the time that he arrived. That he was informed by Stowe Township Police she was located in a grassy area of a parking structure in the rear of 700 Broadway Avenue.

N.T. Suppression Hearing, 2/6/23, at 26-34 (footnote added).

Then, in its 1925(a) opinion, the trial court addressed Appellant's claim that it erred in denying his suppression motion. The court stated, in relevant part, as follows.

- 14 -

The record supports that the initial interaction between Appellant, Chief Bruni, and Officer Dhanse, began as a mere encounter. This is evidenced by the fact that Appellant was only questioned for his name or identification without any command or orders, and despite refusing to provide a name, he was allowed to walk away from the area. However, having followed Appellant for a short distance, all the while continuing to seek his name and identification, the police interaction evolved into an investigative detention once inside the market. A reasonable person in the Appellant's circumstances would not believe that he was free to simply terminate or walk away from the encounter.

In determining whether the totality of the circumstances supported an investigative detention the Court took guidance from **Commonwealth v. Jackson**, 302 A.3d 737 (Pa. 2023). In **Jackson**, an officer responded to an area where he heard gunfire and observed the defendant fleeing on foot. The officer asked him why he was running and the defendant answered that he was running away from gunfire. The officer ordered him to stop and the defendant ignored commands and continued to run. During a foot pursuit, the officer observed the defendant discard items. The [d]efendant was subsequently detained and the discarded items were retrieved and found to be a cell phone and a firearm. The trial court found the detention was unlawful and suppressed the firearm. The Commonwealth appealed and the Pennsylvania Superior Court reversed the trial court's order. (**Commonwealth v. Jackson**, 271 A.3d 461 (Pa. Super. 2021)). Jackson appealed and the Pennsylvania Supreme Court affirmed the Superior Court. In so holding, the [High] Court agreed that the detention of the defendant was lawful, as the record showed: (1) the office encountered the defendant shortly after he heard gunfire; (2) the defendant was running away from the same area; and (3) no other persons were observed. These facts undoubtedly created suspicion that the defendant may have some type of tie to the gunfire which prompted the question from the officer. The Supreme Court noted that the Superior Court commended the officer's conduct as being "precisely the type of continued investigation that the Fourth Amendment demands police undertake before detaining someone." **Jackson**[,] 302 [A.3d] at 741.

Here, an examination of the totality of the circumstances supports that the officers possessed reasonable suspicion of criminal activity to allow for this detention. At the time Chief

Bruni and Officer Dhanse encountered Appellant: (1) they were aware that Cody had been shot; (2) it was close in time to the 911 call and in close proximity to the scene; (3) Appellant matched the physical description [relayed by] the 911 caller, that being a tall black male with facial tattoos; (4) Appellant was dressed in a t-shirt and jeans when the temperature was approximately [20] degrees; (5) Appellant refused to provide his name or identification; and (6) he walked away from officers. In echoing the *Jackson* Court, this [c]ourt agrees that the officers decision to follow Appellant under these circumstances and seek his identification is precisely what the Fourth Amendment demands police undertake before detaining someone. Accordingly, at the time Appellant fled on foot from Chief Bruni and Officer Dhanse he was subject to a lawful investigatory detention. As lawfulness of the detention is dispositive to Appellant's grounds for suppression, it necessarily follows that those arguments fail.

Trial Court Opinion, 2/12/24, at 24-26.

Upon review, we agree with the trial court's assessment and adopt this aspect of its reasoning as our own. We therefore conclude that, in contrast to Appellant's claims, he was not subjected to an unconstitutional investigative detention and the trial court did not err in denying Appellant's motion to suppress on this basis.

In his second issue, Appellant raises a challenge to the discretionary aspects of his sentence. "[S]entencing is a matter vested in the sound discretion of the sentencing judge, whose judgment will not be disturbed absent an abuse of discretion." *Commonwealth v. Ritchey*, 779 A.2d 1183, 1185 (Pa. Super. 2001). Pursuant to statute, Appellant does not have an automatic right to appeal the discretionary aspects of his sentence. *See* 42 Pa.C.S.A. § 9781(b). Instead, Appellant must petition this Court for permission to appeal the discretionary aspects of his sentence. *Id.*

As this Court explained:

> [t]o reach the merits of a discretionary sentencing issue, we conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, Pa.R.A.P. 902, 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [42 Pa.C.S.A.] § 9781(b).

*Commonwealth v. Cook*, 941 A.2d 7, 11 (Pa. Super. 2007).

Generally, to raise a substantial question, an appellant must "advance a colorable argument that the trial judge's actions were: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. McKiel*, 629 A.2d 1012, 1013 (Pa. Super. 1993); *see also Commonwealth v. Goggins*, 748 A.2d 721, 726 (Pa. Super. 2000) (*en banc*). Moreover, in determining whether an appellant has raised a substantial question, we must limit our review to Appellant's Rule 2119(f) statement. *Goggins*, 748 A.2d at 726. This limitation ensures that our inquiry remains "focus[ed] on the reasons for which the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits." *Id.* at 727 (emphasis omitted).

Within Appellant's brief to this Court, Appellant challenges the trial court's decision to impose consecutive sentences for aggravated assault and third-degree murder convictions. Appellant's Brief at 20. Appellant claims

- 17 -

that, in so doing, the trial court imposed an "excessive" sentence because "the Commonwealth proceeded at trial on a theory of transferred intent, *i.e.*, that [Appellant's] alleged actions constituted a single 'criminal episode,' rather than two separate acts." *Id.* at 21.

This Court, however, recently reiterated:

> The general rule in Pennsylvania is that in imposing a sentence, the court has discretion whether to make it concurrent with or consecutive to other sentences then being imposed or other sentences previously imposed. That has led to the standard that in most cases, the court's exercise of discretion in imposing consecutive as opposed to concurrent sentences is not viewed as raising a substantial question that would allow the granting of allowance of appeal. However, each case is to be looked at individually and the key to resolving the preliminary substantial question inquiry is whether the decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case.

*Commonwealth v. Morrobel*, 311 A.3d 1153, 1157 (Pa. Super. 2024) (internal quotation marks and citations omitted).

In our view, Appellant's aggregate sentence of 33 to 66 years' incarceration does not appear, on its face, excessive in light of the criminal conduct at issue, namely, Cody's death which resulted from Appellant's decision to "arm[] himself with a [firearm]," even though as a former felon he was prohibited from possessing a firearm, and then "initiate an unprovoked and violent attack on Travis Prince with no regard for the consequences." Trial Court Opinion, 2/12/24, at 36-37. Hence, we conclude that Appellant's claim

on appeal does not raise a substantial question and we decline jurisdiction over the merits of his challenge to the discretionary aspects of his sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  6/4/2025